Irene Stewart Bourn v. George W. Hinsey, *et ux.*

183 So. 614.
Opinion Filed December 16, 1937.
On Rehearing October 18, 1938.

*McCord & Collins,* for Plaintiff in Error;
*Gregory & Towles,* for Defendant in Error.

CHILLINGWORTH, Circuit Judge.—This writ of error is from a final judgment in a habeas corpus proceeding, wherein the custody of a girl—now nine years of age—was awarded to the respondents, a paternal aunt of the child and the aunt's husband, rather than to the petitioner, the mother of the child. There is little dispute about the facts.

The parents resided in Mississippi, where the child was born. A few months thereafter the mother became ill with tuberculosis. She soon entered a sanitarium and remained there until she was discharged, as cured, in May, 1935. When the mother entered the sanitarium the child was in the custody of the father, who, apparently being unable or unwilling to have the custody of the child, delivered the child to his sister, one of the respondents in this suit. The child has been in the custody of these respondents ever since.

There is no doubt but what they have given the child every attention, affection and care that they could bestow upon her. They have a comfortable home in Quincy, Florida, where the husband is a foreman carpenter for a tobacco corporation, with an annual income of $1,500.00 and perquisites from the farm of his employer.

The mother of the child is a woman of even more modest means. She owns no home and is now residing with her parents, tenant farmers in Mississippi. Apparently her only means of support at the present time, aside from what her parents are able to do for her, is the sum of $35.00 per month paid her by her husband, the father of the child, as alimony.

The petitioner brought a suit in Mississippi against the father of the child, for separate maintenance and alimony. Both parties still reside in Mississippi. The Court, having found the petitioner, as well as the father of the child, fit to have custody of her, awarded the custody to the mother for nine months in the year and the father for three months in the year. The child was then in Florida.

Two questions are presented to the Court. First, is the Florida court required to give full faith and credit to the decree of the Chancery Court in Mississippi, regardless of any considerations involving the welfare of the child, and secondly, whether the welfare of the child requires her custody to be awarded to the petitioner or the respondents.

Upon authority of Beekman v. Beekman, 53 Fla. 858; 43 So. 923, it appears that the domicile of the father being in Mississippi, the child was incapable of making a choice of a domicile in Florida, independently of the father's domicile. Hence, the Mississippi court did have jurisdiction over the child, because it had jurisdiction over both parents, who were before the court. The proceedings of the Court in Mississippi are admissible in evidence. The provisions

of the Final Decree will be followed by the Court here, unless changed conditions or the welfare of the child, require a different adjudication. Minick v. Minick, 111 Fla. 469, 149 So. 483.

In this case we have no showing of any changed conditions. There is nothing to indicate that these respondents, who no doubt deserve the undying gratitude of the mother, for their care of the child at a time when she was unable to care for her, should in any way entitle them to have permanent custody and control of the child. The mother should not be required to pay this debt of gratitude by giving up her child.

The slight difference between the pecuniary advantages of the petitioner and the respondents, while it is worthy of consideration, can in no way induce the court to award the child to those best able financially to provide for the child. The material things of life are important, but far less important than the natural love, affection and care that a mother can, and that this mother no doubt will, give to her child. The welfare of the child is paramount.

She lost her child through no fault of her own. In so far as she has been able, she has continually kept in touch with the child. She is now able to give the child a home, proper schooling, care and attention. In all likelihood the child—who now unfortunately hardly knows her mother—at this tender age of nine, might express a preference to be with the respondents. Even though the record is silent upon this subject, the present inclination of the child should not prevail in this case over the considerations which should entitle a mother to have her own child.

This mother should have the custody of her child. She is fit. She is willing. She is able. She has done nothing that should deprive her of the custody of her child. She walked down through the valley of the shadow of death and

brought this child into the world. She should have her child.

Therefore, we hold that a mother, who is morally fit and able to care for her own child, in her own style of living, is entitled to have her child, even as against those who have, during almost the child's entire life, raised the child and given her every love and attention that they were able to give in their style of life, unless the welfare of the child requires a different adjudication as to her custody.

The judgment is reversed and the cause remanded for the entry of a judgment awarding the custody of the child to the petitioner.

Ellis, C. J., and Terrell, Brown, Buford and Chapman, J. J., concur.

Whitfield, J., not participating because of sickness.

## On Petition for Rehearing.

Per Curiam.—Irene Stewart Bourn of Columbia, Mississippi, brought this proceeding in habeas corpus against George W. Hinsey and his wife, Allye Hinsey, of Qunicy, Florida, to recover custody of Amy Earline Bourn. The petitioner is the natural mother and the defendants were the foster parents of Amy Earline Bourn, who is ten years old. Final judgment was entered for defendants and petitioner took writ of error. In an opinion filed December 16, 1937, the judgment below was reversed. We are now urged on rehearing to review and set aside this judgment.

Being a controversy to determine the custody of the minor, Amy Earline Bourn, the sole question with which we are confronted is whether or not her best interest requires that we recede from our former judgment and affirm the Chancellor.

The record discloses that George J. and Irene Stewart

Bourn were married in November, 1927, and that Amy Earline Bourn was born to this union in October, 1928. Shortly after the birth of the latter, somewhere from six to nine months, it was discovered that Irene Stewart Bourn was afflicted with tuberculosis; she was immediately confined in the State Tuberculosis Sanitarium near Magee, Mississippi, where she remained a patient, except for short intervals until May, 1935, when she was discharged as cured. She brought this proceeding November 25, 1936.

When the petitioner was committed to the Tuberculosis Sanitarium, Amy Earline Bourn was given by her father to George W. and Allye Hinsey to be raised and educated. Allye Hinsey was the sister of George J. Bourn and consequently the paternal aunt of the child. She is now ten years old and has spent all these years in the Hinsey home, where it is admitted that she has received excellent moral, religious, educational, and physical attention. During the time the mother was confined in the sanitarium, the Hinseys carried the child to see her mother regularly. Since being discharged, she has been permitted without objection to visit the child in the Hinsey home.

The petitioner denies that she ever consented that her child should be turned over to defendants, but the evidence and the circumstances are to the contrary. It is shown that in 1932 the child was carried by Mr. and Mrs. Hinsey to Mississippi and turned over to its father and mother, who kept it about three months and returned it to the Hinseys because they were not in a position to look after her and Mrs. Bourn's people could not take it.

It is shown that petitioner and her husband are separated and have not lived together for a long time, that they have been in litigation and have charged each other with infidelity, that George J. Bourn is a disabled war veteran, that his only income is a total disability pension in the sum of

one hundred dollars per month and that his affliction and habits are such as to unfit him to be the custodian of the child.

As to petitioner, it is shown that she lives with her father and mother in Mississippi, where they are tenant farmers and do not own any house or land of their own, but move from year to year and live from what they make by farming on rented land. It appears that they had a chance to take the child when its mother went to the sanitarium, but declined to do so. The petitioner has no income except thirty-five dollars per month alimony paid her by her husband.

The record shows that defendants own a modern home and that George W. Hinsey has for years held a responsible position with a salary of fifteen hundred dollars a year and perquisites, that they are highly respected citizens, have raised the child as if it were their own, in fact have known no difference between it and their own child, have bestowed on it every kindness and affection, that they are giving it religious training, the best of public school advantages, medical and physical treatment, and intend to give it a college education.

A modern home with the latest plumbing, including a kitchen and garage studded with gadgets too numerous to count do not necessarily connote the best interest of the child. The best interest of the child contemplates that training which gives it a keen response to spiritual and moral teachings, makes it self-reliant, engenders in it a love of country, a reverence for law, and an appreciation of the truth that all have an equal right to live, to breathe, to ply a trade, and enjoy the fruits thereof. Washington was imbued with such teachings in gold lace, Lincoln in a crude cabin, and Woodrow Wilson in the cloister, so it makes little difference about the physical state or condition of one's

home.  The difference is in the people who inhabit it, the friends who frequent it, and the spirit which pervades it. This is the pattern by which the question before us must be resolved and the test that the claims of the parties hereto must be subjected.  Any claim based on factors other than this is out of the picture.

We refrain from more than a brief summary of the record on this point, but its implications are more vocal than words in revealing the wide gap between the social, economic, and physical environment of the home in which the child here involved has spent all her life and that in which it is now proposed to take her.  We are not unmindful of the ties of blood and the claim of the natural parent to the custody of its offspring, but when the ties of blood run counter to the force of environment, the former usually give way or tragedy follows.

In this case, the natural mother brought the infant into existence, but at that point, misfortune severed her connection with it.  She was a stranger to it through the years when it was helpless; she has never ministered to it in sickness, knows nothing of its joys and sorrows, never heard it coo and prattle, never pressed it to her breast and rocked it to sleep to the tune of sweet lullabies and has never imparted to it a whit of her character or personality.  All these things have been done by the foster mother, the only mother the child knows and to whom it is devoted.  The foster mother is also devoted to the child.  She has imparted to it those attributes that have made it in her image, and while these facts are not determinative, if they were, the foster mother would have a claim hard to overcome.  To abruptly sever this relation imposes a sacrifice that the law does not exact, subjects the child to a precarious existence and an environment much inferior to that in which it has grown up.

The Chancellor had these facts before him and remanded the custody of the child to the foster parents. On further consideration, we think his decision was correct. We think, however, that if necessary, his decree should be modified to permit the natural mother to visit the child, or if he thinks proper, to have its custody at such times and under such restrictions as he may deem wise to impose. The record affirmatively shows that petitioner has never been precluded from visiting the child and not only that, but it was repeatedly carried by the foster parents to see her when she was in the hospital.

Our former judgment is accordingly rescinded and reversed and the judgment below affirmed with directions accordingly.

Affirmed on rehearing.

WHITFIELD, TERRELL and BROWN, J. J., concur.

ELLIS, C. J., and BUFORD, J., concur specially.

CHAPMAN, J., dissents.

BUFORD, J. (concurring specially).—This case is before us after argument pursuant to rehearing granted.

The history of the case is stated in the original opinion except that it does not state that the child was only four or five months old when the father delivered it to the respondents to be cared for and reared by them, which obligation they have continued to most devotedly perform for some nine years without contribution from the parents.

Respondents were not parties to the suit between the father and mother in the State of Mississippi. In that case only the right to the custody of the child as between the father and mother was involved.

While an infant may not acquire a legal domicile in Florida while the father is domiciled elsewhere (Beekman v. Beekman, 53 Fla. 858, 43 Sou. 923), it is nevertheless

true that an infant is the ward of the court having juris-diction of the person of such infant (31 C. J. 990).

In Danson v. Danson, 76 Fla. 449, 8 Sou. 62, it was said:

"The plaintiff in error states that 'The simple question before this court is whether the father, plaintiff in error, is entitled to the custody of his child.

" 'Under the contentions made in the return, three sub-questions arise:

"1. 'Whether the decree signed by Judge Branning of the Circuit Court of Palm Beach County, awarding the child to his father, can be set aside collaterally or only by appeal and shall remain in force until reversed by this court.

" 2. Whether any collateral attack can be made upon said decree or void its efficacy and full force by a decree made subsequently on a petition for adoption of the child. Can one court, in this collateral way, destroy the decree of the court first having jurisdiction?

" 3. If it could be destroyed in this way, can a decree of the court impart to a mother by adoption rights and powers that the natural mother does not possess?'

"In the decree of the Circuit Court for Palm Beach County granting the petitioner a divorce from his wife and awarding custody of their minor son to the father, petitioner here, such commitment of the minor son to the father's custody was expressly made 'until the further order of the court.' As the welfare of the child is the controlling con-sideration, the quoted limitation in the decree was perhaps unnecessary in view of the jurisdiction and duty of courts in awarding the custody of minor children. In this case the father who obtained the decree in Palm Beach County awarding him the custody of the child, brings this habeas corpus proceeding in Duval County to obtain custody of the child. The proceedings for the adoption of the child by

Effie W. Schumacher may or may not be valid as against the father and are not considered here. In moving, upon the return or answer to the writ, that the infant child be committed to him, the petitioner admitted the averments of the return or answer to be true.

"It appears from the return or answer admitted to be true that the child was with the father's consent in the care and custody of Effie W. Schumacher within the jurisdiction of the Circuit Court for Duval County when on this habeas corpus proceeding brought by the father, the order was made by that court for the custody of the minor child. Without considering whether the answer taken as true and the letters from the petitioner attached as exhibits show the father to be an improper person to have the custody of the minor child, the father is *now* in the United States military service and the person to whom the petitioner indicates he would give the child is shown to be an improper person for such custody. For this reason the award of the present custody of the child to a suitable person by the court having jurisdiction is not clearly wrong; therefore, the judgment of award is affirmed."

So it is seen that in that case the Court refused to hold the Circuit Court of Duval County bound by the former judgment of the Circuit Court of Palm Beach County.

In Robertson v. Bass, 52 Fla. 420, 42 Sou. 243, which was a habeas corpus proceeding instituted by a mother to get custody of her minor child, it was said:

"In controversies of this character, three matters are to be regarded: the rights of the parent, the rights and interests of the person or persons to whom the care and custody of the infant child has been given by the parent, and the welfare of the child. The first of these may be forfeited by misconduct or voluntary reliquishment; the agreement to relinquish is not absolute and irrevocable, but when a con-

tention arises much will depend on the characters of the parties, the length of time elapsed and the circumstances of the particular case; all however subordinate to the interests of the child.

"In the case before us the children are happily placed where they are; the stepfather is a stranger to them and has a large family of his own and has but recently married the mother; it is problematical, therefore, what might be the condition in the new surroundings. After such length of time, the ties of companionship have likely become stronger than the ties of blood and the probabilities of happiness seem stronger where they are.

"In holding with the Circuit Judge that it would be unwise at this stage, at least, to make the change, we are supported by abundant authority. Verser v. Ford, 37 Ark. 27; James v. Cleghorn, 54 Ga. 1; Bentley v. Terry, 59 Ga. 555, S. C. 27 Am. Rep. 399; Smith v. Bragg, 68 Ga. 650; People v. Porter, 23 Ill. App. 196; Bonnett v. Bonnett, 61 Iowa 199, 16 N. W. Rep. 91, S. C. 47 Am. Rep. 810; State v. Barrett, 45 N. H. 15; Clark v. Bayer, 32 Ohio St. 299; Hoxsie v. Potter, 16 R. I. 374, 17 Atl. Rep. 129; Merritt v. Swimley, 82 Va. 433, S. C. 3 Am. St. Rep. 115; Green v. Campbell, 35 West Va. 698, 14 S. E. Rep. 212; Sheers v. Stein, 75 Wis. 44, 43 N. W. Rep. 728; Hurd Hab. Corp. 543; 15 Am. & Eng. Ency. Law (2nd ed.) p. 183, n. 3."

In Marshall v. Reams, 32 Fla. 499, 14 Sou. 95, 37 Am. St. Rep. 118, it was held:

"In all contentions for the custody and control of minor children the benefit and welfare of the child are the principal matters which guide and control the courts in awarding custody. The ties of nature and of association, the character of the applicant for the child, its age, health and sex, the moral or immoral surroundings of its life, the benefits of education and development, the pecuniary pros-

pects, as well as other considerations, enter into the judical determination."

In Sinquefield v. Valentine, *et al.*, 159 Miss. 144, 132 Sou. 81, 79 A. L. R. 238, the Court, quoting from Hibbette v. Baines, 78 Miss. 695, 29 Sou. 80 and 81, 51 L. R. A. 839, said:

"Undoubtedly, the father has primarily, by law as by nature, the right to the custody of his children. This right is not given him solely for his own gratification, but because nature and the law ratifying nature assume that the author of their being feels for them a tenderness which will secure their happiness more certainly than any other tie on earth. Because he is the father, the presumption naturally and legally is that he will love them most, and care for them most wisely. And, as a consequence of this, it is presumed to be for the real interest of the child that it should be in the custody of its father, as against collateral relatives, and he, therefore, who seeks to withhold the custody against the natural and legal presumption, has the burden of showing clearly that the father is an unsuitable person to have the custody of his child; or that, however moral a man he may be, *he had abandoned his child, contributing nothing to its support, taking no interest in it and permitting it to remain continuously in the custody of others,* substituting such others in his own place so that they stand *in loco parentis* to the child and continuing this condition of affairs for so long a time that the affections of the child and of the foster parents have become mutually engaged to the extent that a severance of this relationship would surely result in destroying the best interest of the child." (Underscoring supplied.)

The record in this case shows the existence of the last mentioned condition, which we have emphasized by underscoring.

The Chancellor made findings of fact as follows:

"It appears from the testimony submitted that the petitioner and one George J. Bourn were married to each other on Nov. 10th, 1927, in the State of Mississippi. That on the 20th day of October, 1928, a girl child was born to them. Said child is Amy Earline Bourn, the subject of this controversy.

"At the time of the birth of said child, or shortly thereafter, it was discovered that the child's mother, the petitioner herein, was ill with tuberculosis. It was decided necessary that she enter the State Tubercular Sanitarium, near Magee, Miss., which she did when the child was quite young. She remained in the sanitarium about six years. She was discharged therefrom about May 1st, 1935.

"It seems there is a hiatus as to the care of the infant between the time the mother entered the sanitarium and the time she was placed with the respondents herein by her father. The respondent, Allye Hinsey, is a sister of the child's father. The child was less than a year old when delivered to respondents. Petitioner testified she never consented to, nor was she willing that the child be placed with respondents. The fact and circumstances in the case do not bear out this statement. The mother certainly could not take the child into the sanitarium with her and give it care and attention. The child's father, it appears, is a disabled World War Veteran; that his only income is a total disability pension of One Hundred Dollars per month. The Court gathers from the testimony that the afflictions and habits of the father would very decidedly unfit him for the care and custody of a very young child, especially a girl. The testimony shows that the child's maternal grandparents, William Henry Stewart and wife, are tenant farmers in Mississippi; that they own no land or home of their own; that their income is what they can make on rented

land from year to year; that they do not rent the same place every year. Apparently they did not take the care and custody of the child when the child's mother entered the sanitarium.

"Respondent, Mrs. Hinsey, testified that she visited her brother and her mother in Mississippi about the time the child's mother was preparing to enter the santarium. That her mother is 74 years of age and resides with this brother. That the child was with them on this visit. During this visit she talked with the child's maternal grandmother, Mrs. Stewart; that Mrs. Stewart told her that she, Mrs. Stewart, could not take the care and custody of the child as she had to work in the field. Mrs. Hinsey further testified that, at this time it was agreed among them, including the child's father and mother, that the child be placed with respondents. Shortly after this the father brought the child to Quincy, Florida, and delivered it to them. Mrs. Hinsey further testified that in 1932 she received a letter from the child's mother, in which letter the mother stated that she was coming out of the hospital; that she and her husband were buying themselves a home, and that they wanted the child. She further testified that the father of the child came and took the child back to Mississippi; that they kept her, the child, about three months and that the father brought her back to Quincy, Florida, and placed her with the respondents. Mrs. Hinsey further testified that in 1933 she took the child to Mississippi to visit her mother and her people. That on this visit the child's mother told her, Mrs. Hinsey, that she never intended to try to live with her husband again, and that she wanted her, Mrs. Hinsey, to have the baby.

"From all this it is pretty clear that the child was not placed in the care and custody of respondents against the will and consent of petitioner.

"Shortly after the petitioner was discharged from the

sanitarium in Mississippi she asked for the custody of her daughter. The respondents applied to the Judge of the Circuit Court in and for Gadsden County, Florida, for a decree of adoption. Petitioner protested and the decree of adoption was denied.

"About June 12th, 1935, the petitioner, Irene Stewart Bourn, filed her bill of complaint in the Chancery Court for Marion County, Mississippi, against her husband, George J. Bourn. In this bill of complaint she charged the defendant, among other things, with being an alcoholic and drug addict and of being guilty of adultery. The defendant filed an answer in which he charged the complainant with infidelity. The cause came on for hearing and was heard by the Chancellor. A decree was rendered by the Chancellor on October 11th, 1935. The decree recites, in substance, that the Court has jurisdiction of the complainant and defendant and of the minor child of said parties. The Court found that both complainant and defendant were fit, suitable and proper persons to have the custody of said child. The Court decreed that the complainant have the custody of said child from September 1st to June 1st, and that the defendant have the custody from June 1st to September 1st, each twelve months. The Court further decreed that the defendant pay to the complainant the sum of $35.00 each month for support and maintenance. The Court further decreed that the defendant, George J. Bourn, within thirty days from that date deliver custody of said child to the complainant, Irene Stewart Bourn.

"Attorneys for petitioner in this cause insist before this Court, under the laws of comity, is bound to give full faith and credit to the decree of the Chancery Court of Marion County, Mississippi, this on the theory that the domicile of the parents is the domicile of their minor child. This doctrine will hold good provided the parents over which the

court has jurisdiction, or either one of them has the control of the minor child.

"In the Chancery Case in Marion County, Miss., the parents nor either one of them had control of the custody of said minor, and during the whole of the proceedings in the said chancery court in Marion County, Miss., the said minor was in the custody of the respondents in this cause, George W. Hinsey and Allye Hinsey, at Quincy in Gadsden County, Florida. We hold that the Chancery Court for Marion County, Miss., had no jurisdiction of the said minor child.

"The defendant, George J. Bourn, in undertaking to comply with the decree of the Chancery Court of Marion County, Miss., on the 14th day of January, 1936, filed his petition for a writ of habeas corpus in the Circuit Court in and for Gadsden County, Florida, praying that the custody of said minor child be awarded to him. The writ issued and full hearing had. The judgment of the Court was that the minor child be remanded to the custody of respondents in the instant cause, G. W. and Allye Hinsey."

Whereupon, he remanded the child to the custody of the respondents.

The writer of this opinion, and other members of the Court who will approve the same, feel that a grave error was committed in the adoption of our former opinion and promulgating the judgment thereon. Much has been said, and may yet be said with all propriety, lauding mother's love and delineating a mother's right to the custody of her child. If there is any feeling or emotion which may be favorably compared with mother's love, it is that cultivated love which flows from the breast of a woman to the child of another woman which child she has taken when it was a helpless, crying infant, to her own arms and held as her

own, the child which she has nourished in sickness and in health, which she has watched over and cared for day and night from the time of its early infancy, year, after year, until she has come to look upon it as her very own and to feel for it all that tender love and compassion which a mother's heart can know. Not all women can do this, but to those who can it must be a glorious experience.

In this case we have an incident of that sort. The association with, the care for and the constantly reflected love for the child has bound her as closely to the hearts of the Hinseys as she could possibly be bound to the heart of her mother under existing and past existing conditions.

So if we conclude that the respondents on the one side, by their conduct in the care for and association with the child, have as vital an interest in the child as has its natural mother, who has had practically no association with the child and who has become practically a stranger to the child, then certainly we should be guided by the lodestar in all such proceedings as this, to-wit, "What is to the best interest of the child?" When that point is considered there can be no doubt that the best interest of the child demands that it remain with the respondents.

The record shows that the child is as much devoted to the respondents as she could have been to her natural father and mother had she been reared by them.

It is needless for us to repeat here what has already been quoted from the Chancellor's findings as to the relative ability and opportunity of the respective parties to advance the material, social and spiritual welfare of this child. By all these gauges, the Hinseys prevail.

The law and the evidence amply support the findings of the Chancellor and this Court should not assume to overthrow his judgment.

For the reasons stated, the opinion and judgment heretofore rendered by this Court should be overruled and the judgment to which writ of error was taken should be affirmed.

ELLIS, C. J., concurs.

CHAPMAN, J. (dissenting).—I am unable to agree to the majority opinion in this case. I do not overlook the tender age of the child. The record shows the defendants in error have a good home, substantial annual income, are people of integrity and character, and each has a deep affection for the child with whom it has lived for some years. The entire surroundings of the home are ideal for the growth and development of the moral and spiritual values, for the development of character, the concepts of citizenship and the proper moral standards. I think all of this can be truthfully said of the child's mother, except property holdings. It is unfortunate that the mother should be deprived of her child because she does not have and possess money and property comparable with that of the defendants in error, as her character and moral fitness are beyond question, as shown by the record. The welfare of the child will be observed with its mother the same as with the defendants in error, except the money and property advantages possessed by the defendants in error. The custody of a child when with its parents should never be interfered with for economic reasons. The conduct of the mother here has not forfeited her natural right for the custody of her child. The right of parents to the custody of their children is a well recognized and established principle of law of Florida. See Lee v. Lee, 67 Fla. 396, 65 So. 585; Miller v. Miller, 38 Fla. 227, 20 So. 989, 56 Am. St. Rep. 166; Robertson v. Bass, 52 Fla. 420, 43 So. 243.

If economic reasons are made a guide and basis for awarding the custody of a child, the millionaires of the

Nation can come into Florida and take over the custody of every child of ten years and less and successfully defend their conduct. The mother here is not shown to have moral or character delinquencies; she has not forfeited by her conduct the right to the custody of her child; and the decisions of this Court sustain her rights to her own child.

I think the decision filed December 16, 1937, and prepared by Judge Chillingworth, should prevail.